### WILLIAM S. POWERS *v.* BELLOWS FALLS HYDRO-ELECTRIC CORPORATION.

May Term, 1946.

Present: MOULTON, C. J., SHERBURNE and STURTEVANT, JJ., and BLACKMER and HUGHES, Supr. JJ.

Opinion filed October 1, 1946.

*Ryan; Smith and Carbine* for the petitionee.

*Barber & Barber* for the petitioners.

STURTEVANT, J. This is an appeal from an order of the Windham County Court overruling petitionee's demurrer to the petition. Exceptions were allowed the petitionee and the case comes here before final judgment under the provisions of P. L. 2072.

The petitionee is a public service corporation engaged in the manufacture, sale and distribution of electric energy and for the purposes of that business operates and maintains a dam across the Connecticut River between Bellows Falls, Vermont, and North Walpole, New Hampshire. The petition is brought under the provisions of an act of the Legislature of October 25, 1792, and asks to have the court assess damages for injuries to the property of the

petitioners alleged to have been caused by the maintenance and operation of the petitionee's dam. The act of October 25, 1792, incorporated "the company for rendering the Connecticut River navigable by Bellows Falls" and granted to that corporation the exclusive privilege òf erecting and continuing locks on òr by Bellows Falls on the Connecticut River within the State of Vermont. By successive amendments the original name of the corporation has been changed to The Bellows Falls Canal Company and later to The Bellows Falls Hydro-Electric Corporation and the petitioners claim that the charter provisions of the 1792 act imposing obligations on the corporation now apply to the petitionee. The petitionee specifies as one of its grounds of demurrer that the petition fails "to allege any facts to show that the provisions of the act of October 25, 1792, apply to the petitioners. . . ."

The provisions of that act relied upon by the petitioners are as follows:

> "And it is hereby further enacted by the Authority aforesaid that if it shall be found necessary to fully effect the intention of this act to erect a dam on Connecticut River and thereby flow or otherwise injure the property of any of the good citizens of this State such person or persons so injured shall upon application to the county court for the county of Windham be entitled to receive from the company aforesaid such compensation as the county court shall adjudge just and equitable for the injury which such person or persons has sustained or probably may in future sustain by flowing the said land or in any other way whatsoever and a record being made thereof by the clerk of said court shall be a complete bar to any future application for any compensation for any injury done to the same property whether real or personal and any action for damage sustained by the dam aforesaid shall be commenced in the mode prescribed by this act and in no other unless the company shall have failed to pay the sum or sums assessed by the court aforesaid any law usage or custom to the contrary notwithstanding."

The first part of the charter paragraph from which the above quotation is taken deals with a method of providing compensation to owners for lands which it "may be found necessary" to take for the construction of locks as contemplated by the act.

The material allegations in the petition may be briefly stated as follows: The petitioners own land in Westminister below Bellows Falls and on the Connecticut River. The petitionee is a Vermont corporation organized by law pursuant to the Acts of the Legislature of October 25, 1792, and subsequent amendments. The petitionee in 1928, removed the dam it had previously maintained at Bellows Falls and replaced it with a new dam having five bays or sections in three of which flashboards were installed and the other two were equipped with rollergates. The flash boards extended about 13 feet above the concrete crest of the dam and can be removed at will. The gates when closed extend about 17 feet above the concrete crest and can be raised clear of the water. This dam as maintained raises the water about 11 feet higher than the old one and the pond thus formed extends about 26 miles above the dam. At about the same time the petitionee widened and deepened the canal and at its lower end installed a hydro-electric plant for the purpose of generating electricity from water power. This plant is capable of passing water at a greater flow rate than the plant formerly maintained by the petitionee for water power purposes. The new dam is operated so as to keep the water level in the pond just below the top of the flashboards and gates when closed. Every time the river rises to high water stage, this level is maintained by opening the gates and removing the flashboards, thus increasing the natural stream flow at such times. Also at about the time the new dam was built, the petitionee widened and deepened the gorge below the dam and removed rock formations therefrom and revetted the banks so that the gorge is now capable of passing water faster and in greater volume than before this was done. This new gorge condition, in connection with the operation of the dam, materially increases the stream flow below the dam during flood times. The petitionee periodically closes off the flow of the stream at the dam in order to store water in the pond for the operation of the wheels thus causing a substantial fluctuation in the water level below the dam and on the premises of the petitioners whereby their lands are being eroded and sloughed off and the stream channel is

gradually being filled. The water current in the pond above the dam is slower than the natural river flow there would be and this condition in connection with the operation of the dam causes ice to form along the banks in winter in large quantities and to reach a greater thickness on the pond surface than it would otherwise do. For these reasons the ice does not break up as early in the spring as it does above the pond and this condition results in ice jams forming at the upper end of the pond causing the water to be retarded in its flow until such time as the ice goes out releasing large quantities of water and greatly increasing the natural flow of the stream. The petition further alleges: "By reason of the premises, or some of them, in concurrence with freshets, the petitioners' lands have been overflowed, flooded and eroded, the river banks wholly washed away in places, huge deposits of sand and debris left on other portions of petitioners' lands, thereby damaging them for agricultural purposes, or any purpose; that the petitioners' buildings were damaged in, to wit, 1936." The petition concludes with a prayer for a hearing before the Windham County Court and assessment of damages in accordance with the provisions of the act of October 25, 1792, as hereinbefore set out.

The petitioners contend that while the charter provisions in the Act of 1792 originally applied to a dam erected for the purpose of making the Connecticut River navigable by Bellows Falls, by subsequent amendments those provisions are made to apply to the dam and plant of the petitionees described in the petition. The first amendment of the charter to which our attention is directed is made by No. 135 of the Acts of 1869. Among other provisions of that act are the following. "All the rights and privileges heretofore granted said company are hereby extended to them for the purpose of manufacturing, selling or renting of water power and the transaction of such business as may be incidental thereto." This act contains the first mention of using the dam for power rather than navigation purposes. However, it contains no specific reference to the use of the dam for the generation of electric energy nor the sale and distribution of same for public use. The petitionee received its first legislative grant of authority to so do under the provisions of No. 365 of the Acts of 1912, which act is also an amendment to the 1792 charter. In section 1, that act states: "The Bellows Falls Canal Company chartered by an act approved October 27 (sic)

1792 . . . under the authority of which it has ceased to render navigation service." The amendment makes petitionee's rates for electric energy to be furnished for public use subject to the jurisdiction of the Public Service Commission. Section 9 of that act states:

> "Said Bellows Falls Canal Company shall at all times be subject to the general laws of this state from time to time in effect and applicable to water power corporations, and shall be subject to all duties, limitations and restrictions imposed thereby; and if at any time said Bellows Falls Canal Company shall engage in the business of manufacturing, distributing and selling to the public electricity for light, heat or power purposes, it shall be under and subject to all general laws of this state then and from time to time in effect applicable thereto, and shall be subject to the duties, limitations and restrictions thereby imposed, and shall be subject to the supervision and authority of the Public Service Commission in the manner and to the extent provided in Act. No. 116 of the Acts of 1908 and any acts amendatory thereof or supplemental thereto."

No. 163 of the Acts of 1915 deals with public service corporations other than railroads. Section 9 of that act states:

> " . . .. All corporations heretofore formed by special act or under the general laws of this State, which are conducting any business (other than a railroad business) subject to regulation by the public service commission, shall, with respect to all future acts, be deemed to be within the provisions of this act and the provisions of the general corporation act in like manner as a corporation formed hereunder, but no corporation heretofore formed shall do any act in violation of any restriction contained in its charter. But such repeal shall not affect any proceedings before the public service commission heretofore begun, and the foregoing provisions of this section shall be subject to all exceptions and qualifications as are contained in § 42 of the general corporation act."

From the foregoing it appears that the provisions of the 1792 Act relied upon by the petitioners provided a method by which a property owner could obtain compensation for damage suffered because of the erection of a dam necessary "to fully effect the intention" of that act, that is, to make the Connecticut River navigable by Bellows Falls. The damages alleged in the petition are claimed to result from the operation of the petitionee's hydro-electric plant, including a dam erected in 1928 for the purpose of furnishing water power for the generation of electric energy. There is no provision in the Act of 1792 making provisions of that Act applicable to any dam other than the one named in the act and there are no provisions in the amendments of the acts of 1869 and 1912 bringing those provisions of the 1792 act forward and making them applicable to the facts stated in the petition. The question here presented is similar to that considered by this Court in *Foster* v. *Stafford National Bank*, 57 Vt 128, 132. Briefly stated the facts in that case were as follows. By an act of the Legislature of 1874 Foster was given authority to enter on the river forming the outlet of Lake Willoughby and remove obstructions therefrom for the purpose of making the river navigable for floating logs on that portion of the river designated in the act. The river so improved was open for public use for the purpose stated. § 2 of the act provided a method of fixing and obtaining payment of damages that might result from the performance of the acts authorized in the first section. It was later thought that the river would be of greater use for floating logs if gates were installed at the outlet of the lake, for the purpose of controlling the flow of water from the lake into the stream. The Legislature of 1878 granted Foster the authority to so install gates for the purpose stated. The owner of the land on which the gates were placed interfered with the operation of the gates and Foster brought a bill in chancery asking that the landowner be restrained from such acts. Concerning this matter this Court stated at page 132, 57 Vt as follows: "No provision is made in the amendment for the ascertainment and payment of the damages that might be occasioned by the entry upon and the occupation of the land of the defendant for the erection and maintenance of gates thereon and the raising of waters of the lake. It is claimed that the amendment is subject to the provisions of the act of 1874 . . . but that act makes no provision for the ascertainment and payment of damages for such acts as the orator was

authorized to do under the act of 1878." For the reasons stated it was held that the provisions in § 2 of the 1874 act did not apply to the acts of Foster authorized by the 1878 amendment. Also see *Coe* v. *Hall,* 41 Vt 325. In the case at bar it is to be noted that the 1912 amendment makes the petitionee subject to the general law of the State then in force and also to subsequent legislative enactments applicable to the privileges granted therein thus making the petitionee subject to the provisions of No. 163 of the acts of 1915 hereinbefore mentioned.

In *Trybulski et al* v. *Bellows Falls Hydro-Electric Corporation,* 112 Vt 1, 20 A2d 117, the petitioners in the case at bar joined with others in a petition to the public service commission asking that, in accordance with the provisions of the petitionee's 1792 charter, the commission assess past and future damages which it was claimed had resulted and would in the future result to petitioners' property from the operation of petitionee's dam. The dam there mentioned is the same one with which we are concerned in this case. For reasons stated in the opinion, this Court held that the public service commission was without jurisdiction to assess damages under the provisions of the 1792 charter as prayed for in the petition.

From what has been hereinbefore stated, it follows that the original charter provisions, here relied upon by the petitioners, have no application to the petitionee in the performance of those acts and the exercise of the privileges authorized by the 1912 amendment and subsequent legislative enactments. As to those, the 1912 amendment makes the petitionee subject to the general law then applicable and to all subsequent material legislation. As to the alleged wrongful acts set forth in the petition, the petitionee stands in the same position and is liable to the same extent and in the same manner as though it were a corporation formed under the general law of this state after the passage of No. 163 of the Acts of 1915 and before the erection of the dam described in the petition. It follows that the petitionee's demurrer should have been sustained on the grounds stated therein. The conclusion here reached makes the consideration of other questions briefed unnecessary.

*Judgment overruling the petitionee's demurrer is reversed, the demurrer is sustained and the petition is dismissed with costs to the petitionee.*